[Civ. No. 2444. Fourth Appellate District.—November 6, 1939.]

SOUTHERN PACIFIC COMPANY (a Corporation) et al., Appellants, v. COUNTY OF RIVERSIDE, Respondent.

The facts are stated in the opinion of the court.

W. I. Gilbert for Appellants.

Earl Redwine for Respondent.

MARKS, J.—This is an action to recover $1540.58, taxes paid under protest to defendant for the use of the Coachella Valley Storm Water District. A demurrer was sustained to the complaint. Plaintiffs failed to amend within the time allowed and the judgment from which this appeal is taken was entered. The grounds of special demurrer are not argued. We therefore assume they have been abandoned.

The Coachella Valley Storm Water District, which we will refer to as The District, was organized under the Storm Water District Act of 1909. (Stats. 1909, p. 339, as amended.) Certain pertinent facts of its organization and early activities are set forth in *Southern Pacific Co.* v. *Stibbens*, 103 Cal. App. 664 [285 Pac. 374], and will not be repeated here.

Plaintiffs paid, under protest, both instalments of taxes for the fiscal year 1936–37. The protest to the first instalment went to the following items: $428.20 for current expenses for the maintenance and improvement of the works of The District, assessed and levied on personal property of plaintiffs; $278.09 for like current expenses assessed and levied on the improvements of plaintiffs; $278.09 for like current expenses assessed and levied on the improvements of plaintiffs (this would seem to be a duplication which is not repeated in the complaint); $278.09 for payment of bonds and interest, assessed and levied on the improvements of plaintiffs. The protest to the second instalment went to items totaling $556.20, composed of the following: $278.10 for current expenses for the maintenance and improvement of The District, assessed and levied on the improvements of plaintiffs; $278.10 for payment of bonds and interest of The District assessed and levied on the improvements of plaintiffs.

For the purposes of this opinion we will assume that the "improvements" which were assessed, consisted of buildings, tracks, and other such things which had been firmly and permanently attached to the soil and which were in the nature of fixtures.

Plaintiffs urge that the Storm Water District Act of 1909 only permitted the assessment and taxation of their *lands* for district purposes; that the term "land" is there used in its narrowest sense, to indicate the ground alone, and does not include fixtures or like "improvements"; that the act does not permit the assessment and taxation of any of their personal property, fixtures or improvements. They further urge that these questions were determined and settled in their favor by this court in the case of *Southern Pacific Co.* v. *Stibbens, supra.*

A study of the Storm Water District Act of 1909 discloses a loose, indiscriminate and somewhat confusing use of the terms "land", "lands", "owners of land", "property", "freeholder", "lot or parcel of land", "land or any improve-

ments thereon'', and ''real property''. We believe that a brief summary of those sections of the act where those terms appear is necessary to the solution of the problem presented. The emphasis hereafter appearing is ours.

Section 1 of the act deals with the preliminary proceedings leading up to the formation of a district. It is there provided that a district may be formed for the protection of ''lands'' within its boundaries; that it may include within its exterior boundaries ''land'' lying within incorporated territory and ''land'' in unincorporated territory; that a petition for organization of a district must be signed by not less than twenty-five per cent of the ''owners of land'' therein; that where the area to be organized into a district lies in one county the petition must be presented to the board of supervisors ''in which said land lies''; that where it lies in more than one county it must be presented to the board of supervisors of the county in which ''the greater area of such land lies''.

Section 2 provides for giving notice of intention to form a district. It is there provided that the notice '' . . . shall state that it is proposed to assess all *property* embraced in said proposed stormwater district . . . ''. This section also provides that the assessor shall certify to the county clerk '' . . . the name of each owner of *land* in the proposed district'' to whom a notice shall be sent.

Section 4 provides for a hearing and action by the board of supervisors on the petition. It also provides ''that no such district shall be formed wherein a majority of the owners of *property* . . . '' object.

Section 5 provides that the governing body of the district shall consist of three trustees, each trustee to be a ''freeholder'' of the district, with one trustee an ''eligible *freeholder*'' in the unincorporated portion of the district, if there be such portion.

Section 8 defines the powers of the district and provides for its contracts and emergency work. The district is given the power, among other powers, to protect the *''lands''* within its boundaries from damage.

Section 11 concerns itself with the functions of commissioners who are required to view the ''land'' to be taken for improvements, to estimate its value and the damage to ''property'' affected thereby; to assess the value of the ''lands'' taken and damage to ''property'' upon the *''lands''* em-

braced within the boundaries of the district. After crediting any appropriation to the cost of the work made by a county or counties, the commissioners shall assess the balance necessary to construct the improvements "upon the *lands* in said district in proportion to the benefits . . . including in said assessment the *property* of any rail road company within said district, if such there be".

Section 12 provides for the report of the commissioners. It concerns itself with "the *land* assessed"; "each lot or parcel of *land* to be taken, damaged or assessed"; "each lot, or parcel of *land* to be assessed" and "the amount assessed against each such piece or parcel of *land*".

Section 13 directs the commissioners, in their assessment, when they are in doubt as to the "ownership of any lot or parcel of *land* or any *improvement thereon,* or of any interest in such *land* or *improvement*", to set it down "as belonging to unknown owners".

Section 16 gives the trustees of a district power to extend payments of assessments over a period of years where the cost of the improvements is "too great to be raised in one year by assessment against the *property*" in the district. It further provides that the first assessment against "each parcel of *land*" shall become due immediately and that the assessments "against each parcel of *land* shall constitute a lien thereon"; that deferred assessments "on any parcel of *land*" may be paid at any time. It is also provided that in case the district shall be situated in more than one county the report, assessment and plat shall be filed with the tax collector of each county and each tax collector shall "proceed as to the *property* in said district within his own county in the manner hereinafter directed, and the assessment on the *property* in said county shall be collected in the manner hereinafter directed".

Section 25 contains the following: "Where new or additional improvements have been constructed other than those which have been constructed under the first proceedings had for that purpose, all moneys required for the maintenance and repair of such improvements shall be chargeable and collected only as against *the land* which originally bore the cost of such improvements. Such board or boards of supervisors shall at the time of making the levy of taxes for county purposes for that year, levy a tax upon *the property* in their

county in said district sufficient in amount to raise the sum estimated by the board of trustees to be necessary.''

Section 26d provides that the bonds shall be ''a lien upon the *property* of the district'' and that their principal and interest ''shall be paid by revenue derived from an annual assessment upon the *real property* of the district; and all the *real property* of the district shall be and remain liable to be assessed from such payments''.

Section 26e requires the board of supervisors to ''levy a tax upon the *real property* in their county in said district, sufficient in amount to raise the sum estimated by the board of trustees to be necessary''.

Section 27 provides for the disincorporation of a district and requires a petition ''signed by a majority of the *land* owners'' to initiate the proceedings.

Section 28 provides for the exclusion from, or inclusion in the district, of *property* upon a petition signed by ''owners of *land*''.

From this review of some of the provisions of the Storm Water District Act of 1909 it is clear that it is necessary for us to determine the intention of the legislature in using such terms as ''land'', ''property'', and ''real property'', and the meaning which must be given them, as on the face of the act at least some of the provisions are conflicting. In doing this a statement of some of the principles of statutory construction which must guide us seems advisable.

In the case *In re Washer*, 200 Cal. 598 [254 Pac. 951], the Supreme Court said:

''We are mindful of the rules of construction which must bind us, which said rules are as follows:

'' 'Absurd or unjust results will never be ascribed to the legislature and it will not be presumed to have used inconsistent provisions as to the same subject in the immediate context. The courts will be astute to avoid such results. (*Wells Fargo & Co.* v. *Mayor etc. of Jersey City,* 207 Fed. 871.) In the interpretation of statutes courts are not bound by grammatical rules, and may ascertain the meaning of words by the context. (*Cavender* v. *Hewett,* 145 Tenn. 471 [22 A. L. R. 755, 239 S. W. 767].)

'' ' ''The mere literal construction of a section in a statute ought not to prevail if it is opposed to the intention of the legislature apparent by the statute; and if the words are

sufficiently flexible to admit of some other construction it is to be adopted to effectuate that intention. The intent prevails over the letter, and the letter will, if possible, be so read as to conform to the spirit of the act. 'While the intention of the legislature must be ascertained from the words used to express it, the manifest reason and the obvious purpose of the law should not be sacrificed to a literal interpretation of such words.' Words or clauses may be enlarged or restricted to effectuate the intention or to harmonize them with other expressed provisions. Where general language construed in a broad sense would lead to absurdity it may be restrained. The particular inquiry is not what is the abstract force of the words or what they may comprehend, but in what sense they were intended to be used as they are found in the act.'' (Lewis' Sutherland on Statutory Construction, 2d ed., sec. 376, p. 721.)' (*In re Haines,* 195 Cal. 605, 613 [234 Pac. 883, 886].)''

In *Fresno City High School District* v. *DeCaristo,* 33 Cal. App. (2d) 666 [92 Pac. (2d) 668], it was said:

''It is a cardinal rule of construction that, where possible, every clause and word of a statute should be given effect and meaning. (Sec. 1858, Code Civ. Proc.; *Smith* v. *State Board of Control,* 215 Cal. 421 [10 Pac. (2d) 736]; *County of Los Angeles* v. *Graves,* 210 Cal. 21 [290 Pac. 444]; *Crowe* v. *Boyle,* 184 Cal. 117 [193 Pac. 111]; *Gill* v. *Johnson,* 103 Cal. App. 234 [284 Pac. 510]; *Cory* v. *Cooper,* 117 Cal. App. 495 [4 Pac. (2d) 581].) It is equally true that in construing the component parts of a legislative act the courts should, where possible, give force and effect to each so that the whole act may have life and vitality. (*Ahern* v. *Livermore Union H. S. Dist.,* 208 Cal. 770 [284 Pac. 1105]; *In re Haines,* 195 Cal. 605 [234 Pac. 883]; *People* v. *Rabe,* 202 Cal. 409 [261 Pac. 303].)''

From the foregoing rules it is clear that if the terms we are considering have similar meanings which may be applied to them without doing violence to the language of the statute we should adopt those definitions so as to do away with apparent inconsistencies in the act.

''Land'' is defined by section 659 of the Civil Code as '' . . . the solid material of the earth''. It is clear that this definition, strictly construed, does not include fixtures attached to the land. This definition must be considered in the

light of section 829 of the Civil Code, which provides that "The owner of land in fee has the right to the surface and to everything permanently situated beneath or above it." These sections codify part of the common-law doctrine of fixtures. It is stated in section 660 of the same code that, "A thing is deemed to be affixed to land when it is attached to it by roots . . . or imbedded in it . . . or permanently resting upon it. . . . " This definition assists in determining when personalty "is deemed to be affixed to land" so that it becomes a part of it. (See *Miller* v. *Waddingham,* 3 Cal. Unrep. 375 [25 Pac. 688, 11 L. R. A. 510]; *Miller* v. *Waddingham,* 91 Cal. 377 [27 Pac. 750, 13 L. R. A. 680].) It is thoroughly settled that fixtures become a part of the land and pass to a purchaser with the fee of that land. Thus, perhaps, we find a reason for the rather common use of the word "land" to include not only "the solid material of the earth" but also fixtures and that which is incidental or appurtenant to the land. (See Black's Law Dictionary 723; Webster's New International Dictionary, p. 1209; 50 Cor. Jur. 752; 22 R. C. L. 55.) In the last-cited authority it is said:

"The word 'land' both in England and here is a word of art. It is *nomen generalissimum* and includes, not only the soil, but everything attached to it, whether attached by the course of nature, as trees, herbage, and water, or by the hand of man, as buildings and fences. While it generally refers to something corporeal, it may include a franchise connected with land. This is the broadest of the two common law meanings of the term. . . . Ordinarily, however, the term is used as descriptive of the subject of ownership and not the ownership. Thus, in its broadest sense it will be seen that 'land' in its legal signification embraces much more than the word literally imports, and includes many things besides the soil itself, as waters, grass, stones, buildings, fences, trees, and the like, and in fact all things which have become a part of the soil."

Thus we find that the term "land" has a definite and well-accepted meaning that is synonymous with the term "real property", defined by section 658 of the Civil Code as including: "1. Land; 2. That which is affixed to land; 3. That which is incidental or appurtenant to land; 4. That which is immovable by law . . . ," with certain specified exceptions.

With these definitions in mind we find no difficulty in concluding that the legislature, in the Storm Water District Act of 1909, used the terms "land" and "lands" as interchangeable and synonymous with the term "real property". By so holding we remove seeming inconsistencies in the act, harmonize its terms, bring them into a state of conformity and make them easily applicable in the matter of taxation, except where the word "property" is used.

"Property" has a much broader meaning than does "land" or "real property". It is thus defined in Black's Law Dictionary: "The word is also commonly used to denote everything which is the subject of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible, real or personal; everything that has an exchangeable value or which goes to make up wealth or estate." Thus we find that there is another apparent conflict in the terms of the act. In places it seemingly limits the taxing power to the taxing of "land" or "real property", and elsewhere it apparently gives the power to tax "property". These conflicts seem particularly apparent in the portion of section 25 which we have already quoted and in section 26d of the act.

The portion of section 25 with which we are here concerned applies only in a case where additional improvements have been constructed to supplement the original works. It is there first provided that the cost of maintenance and repair of those additional improvements "shall be chargeable and collected only as against the *land* which originally bore the cost of such improvements". In the next sentence it is provided that the taxes to pay for such additional improvements shall be levied "upon the *property*" in the district.

Section 26d has to do with bonds issued by the district. It is first provided that such bonds shall be a lien upon the "*property*" in the district. It is next provided that the "*real property*" in the district shall be assessed to pay the principal and interest of the bond issue and that such "*real property* . . . shall be and remain liable to be assessed from such payments*".

When we consider the act as a whole we think it rather clear that the legislature intended to make only real property assessable for the purposes of taxation by a district. This is made evident by the much more frequent use of the terms "land" and "real property" than the use of the word "property"

and by the further fact that in several places where "property" is used that word is qualified by other expressions showing the clear intention to tax only "land" or "real property."

We therefore conclude that where the Storm Water District Act of 1909 purports to give the right to assess and tax the "property" in the district, the legislature only intended to confer the right to tax "real property". It is well settled that courts must, where possible, hold legislative enactments constitutional and must construe them so they may be understandable and workable. In so doing we are not bound by a word which was mistakenly used in a sense not justified by the context. We must be governed by the intent and purpose of the entire act rather than by the definition of a particular word used in it. In 23 California Jurisprudence, 738, it it said:

"In accordance with the settled rule that courts, when possible, construe statutes so as to carry out the legislative intent, a statute will be read as apparently intended, regardless of mistakes, errors or omissions therein. It is not the duty of courts, by a blind adherence to the letter of the law, to perpetuate mistakes inadvertently made by the lawmaker. Accordingly, where the context of a statute, or other considerations arising therefrom, show that a word was erroneously used by the legislature for another word which, if substituted, will harmonize the statute with its obvious purpose and intent, the statute will be read as though the intended word had been used."

Plaintiffs urge with great force and sincerity that by the decision in the case of *Southern Pacific Co.* v. *Stibbens, supra,* we have established that, under the Storm Water District Act of 1909, only the land, meaning "the solid material of the earth", may be assessed and taxed for district purposes and that improvements on the land cannot be taxed. Counsel bases his argument on the fact that we used the term "land" exclusively throughout the opinion when speaking of that which might be assessed and taxed, and stresses the following quotations from that opinion:

"The assessment, which is composed of the cost of the improvements, including any damages that may be awarded, 'shall be made upon the lands in said district in proportion to the benefits to be derived by such lands from said improvements, including in said assessment the property of any rail-

road company within said district, if such there be'. (Sec. 11, Storm Water District Act of 1909.) The word 'property' as used in this quotation, must be held to refer to, and include only 'land' as it is clear from the act that no property other than land is to be assessed under its terms. . . .

"Appellant further complains of the assessment levied because it insists that it includes the franchise, roadway, roadbed, rails and rolling stock of the company. We do not so read the assessment in the record before us. The assessment is copied in full and shows only a strip of land 165 feet wide through various sections described, with an amount in money following each of the several parcels described. We cannot construe this to be an assessment on anything more than it shows. From all that appears in the records, the amounts entered are the benefits charged against the lands described in the report of the commissioners and approved by the trustees of the district.''

We have again carefully reviewed the record in the Stibbens case and find that the question confronting us here, which is, whether the land (defined as the solid material of the earth) without the improvements on it, or the land with the improvements on it, or land, improvements and personal property, might be assessed and taxed, was neither presented nor considered there. It should be sufficient to say that when we used the term ''land'' in that opinion, we used it in the sense and with the meaning which we have given it in this opinion, and which we believe the legislature intended in the Storm Water District Act of 1909 as being the equivalent of and interchangeable with the term ''real property''. However, it is rather clear from the first quoted paragraph of the opinion in the Stibbens case that we did not then, as we do not now, regard personal property taxable for the purposes of the district.

As it appears from the complaint that plaintiffs paid, under protest, the sum of $428.20, in taxes, levied on their personal property, the pleading stated a good cause of action for the refund of that sum of money. It follows that the demurrer, which was to the entire complaint, should not have been sustained.

Plaintiffs have attempted to appeal from the order sustaining the demurrer to their complaint. Such an order is not appealable. (Sec. 963, Code Civ. Proc.)

390

The judgment is reversed. The attempted appeal from the order is dismissed.

Barnard, P. J., and Griffin, J., concurred.

A petition by respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on January 4, 1940.

Edmonds, J., voted for a hearing.

Carter, J., did not participate.